**SEALED**

FILED

April 6, 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
By: _____ SAJ _____
Deputy

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

Case No: **SA-22-CR-00170-XR**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| **Plaintiff** | |
| v | **INDICTMENT** |
| **(1) XIAOJIAN TAO** | **COUNT 1:** 22 U.S.C. §§ 2778(b)(2), 2778(c), and 22 C.F.R. §§ 121.1, 123.1, 127.1 & 127.3: Illegal Export of Defense Articles; |
| **(2) YU LANG aka LAURA LONG** | |
| **Defendant** | **COUNT 2:** 50 U.S.C. § 4811 et seq. - Unlawful Export of Commerce Controlled Goods; |

**COUNT 1:** 22 U.S.C. §§ 2778(b)(2), 2778(c), and 22 C.F.R. §§ 121.1, 123.1, 127.1 & 127.3: Illegal Export of Defense Articles;

**COUNT 2:** 50 U.S.C. § 4811 et seq. - Unlawful Export of Commerce Controlled Goods;

**COUNT 3:** 18 U.S.C. §§ 1343, 1349: Conspiracy to Commit Wire Fraud;

**COUNTS 4-12:** 18 U.S.C. § 1343: Wire Fraud;

**COUNT 13:** 18 U.S.C. § 371: Conspiracy to Defraud the United States;

**COUNTS 14-18:** 26 U.S.C. § 7206(1): Filing False Tax Returns;

**COUNT 19:** 50 U.S.C. § 4811: False Statement E.C.R.A.;

**COUNTS 20-22:** 18 U.S.C. § 1001: False Statements

THE GRAND JURY CHARGES:

## Introduction

At all times relevant and material to this Indictment:

1

1.      COMPANY 1 is one of the oldest and largest independent, nonprofit, applied research and development (R&D) organizations in the United States.  Founded in 1947, COMPANY 1 provides contract research and development services to industrial and government clients in the United States and abroad.  COMPANY 1 is a Cleared Defense Contractor, which offers multidisciplinary, problem-solving services in a variety of areas in engineering and the physical sciences.

2.      Defendant Xiaojian Tao's field of research at COMPANY 1 was in fuel systems and contamination control research, where he worked on projects which included the design, development and testing of automotive air, fuel, and oil filters and filtration systems, industrial filtration and process control, and engine component wear studies using surface layer activation and bulk radioactive tracer techniques.

3.      During Tao's tenure at COMPANY 1, he served as a member of COMPANY 1's Internal Research and Development (IR&D) committee.  The IR&D committee controls all of COMPANY 1's internal research and development projects and determines which projects will be funded and pursued, and which ones will not.  Tao's position on the IR&D committee permitted Tao unrestricted access to the latest unclassified innovations for which COMPANY 1 scientists and engineers sought approval and funding.  Some of these projects may contain proprietary information and some may be subject to export control restrictions requiring a license before being exported from the United States.

4.      Defendant Yu Lang is the wife of Defendant Tao.

5.      Tyletech was created by Defendant Tao and Defendant Lang on or about 1997 to provide engineering consulting, specialty sensors development, smart controllers development and prototyping, and experiment and test equipment development. Defendant Lang served as the

named head of Tyletech. Defendant Tao's role was to provide the knowledge, consulting, and expertise to allow the Defendants to operate in direct competition to COMPANY 1.

6.     Tylex Tech LLC was formed on or about May 22, 2008.  Defendant Lang was the initial registered agent/Managing Member and Defendant Tao was serving as a Managing Member.  On or about 2010, Defendant Lang was listed as the President of Tylex Tech and Defendant Tao as the Vice President.  On or about June 13, 2012, records with the Bexar County Clerk identify an Assumed Name Certificate for Tyletech, aka Tyle Tech, with Defendant Lang being listed and signing as the Registrant.  The address listed for both Tylex Tech and Tyletech is the residential address of Defendants Tao and Lang.

## COUNT ONE
### [22U.S.C. §§ 2778(b)(2), 2778(c) and
### 22 C.F.R. §§ 121.1, 123.1, 127.1, and 127.3]

The Introduction to this Indictment is hereby incorporated as if fully set forth.

## The Export of Defense Articles

1.     The export from the United States of arms, munitions, weapons, equipment for military use and related components, and the technology to design, build and test such items ("defense articles and defense services"), is strictly controlled and regulated under federal law.

2.     The Arms Export Control Act, Title 22, United States Code, Sections 2778, et seq., authorized the President of the United States to control the import and export of defense articles and defense services in furtherance of world peace, national security, and the foreign policy of the United States.  Section 2778(b) provided that any person engaged in the business of exporting any defense articles shall register with the United States Department of State ("State Department").  Section 2778(c) established criminal penalties for any willful violation of Section 2778 or any rule or regulation thereunder.

3.     The International Traffic in Arms Regulations (ITAR), Title 22, Code of Federal Regulations, Parts 120-130, were the regulations that implemented the President's authority with respect to the export of defense articles.  By virtue of the authority delegated by the President to the Secretary of State, the State Department's Deputy Assistant Secretary of State for Defense Trade Controls, Bureau of Political-Military Affairs, was primarily responsible for administering the ITAR.

4.     The ITAR contained a list of defense articles and defense services which were subject to control by these regulations.  The list was called the United States Munitions List ("USML"), Title 22, Code of Federal Regulations, Part 121.1.

5.     No defense articles or defense services may be exported or otherwise transferred from the United States to a foreign country without a license or written approval from the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), according to Title 22, Code of Federal Regulations, Part 123.1.

6.     Since on or about 1990, the United States government has maintained an Arms Embargo against China that prohibits the export, re-export, or re-transfer of any defense article to China.   Beginning on or about February 1990, the U.S. Congress has prohibited the export of defense articles, technical data, and services to China.  Thus, since 1990, it has been the policy of the United States and the U.S. Department of State to deny license applications and any other written requests or approvals for the export, re-export, or retransfer of defense articles destined for China.

7.     At all times material to the Indictment, the Qualification Test Procedure for Valve, Pressure Relief for the F-35 Joint Strike Fighter was a defense article on the USML.  Title 22, Code of Federal Regulations, Part 121.1 (Category VIII(i)).

4

8.     Neither the Defendant nor any agent of Tylex Tech LLC or Tyletech, or anyone else known or unknown to the Grand Jury, ever applied for, received, or possessed a license from the Department of State to export defense articles to China.

## The Charge

On or about May 15, 2019, in the Western District of Texas, the District of New Jersey, and elsewhere, the Defendant,

## (1) XIAOJIAN TAO

did willfully and knowingly export from the United States to China, a defense article, to-wit:

| Document Title | Tracking Number | Platform or System | USML Category |
|---|---|---|---|
| Qualification Test Procedure for Valve, Pressure Relief | RR20200929SA | F-35 Joint Strike Fighter (U.S. Military Aircraft) | VIII(i) |

of the United States Munitions List and the Defendant did so without having first obtained from the Department of State a license for such export or written authorization for such export.

In violation of Title 22, United States Code, Sections 2778(b)(2) and 2778(c), and Title 22, United States Code of Federal Regulations, Sections 121.1, 123.1, 127.1, and 127.3.

## COUNT TWO
### [50 U.S.C. §§ 4819(2), 4811 *et seq.*]

The Introduction to this Indictment is hereby incorporated as if fully set forth.

## Export Control Reform Act

1.     The Export Control Reform Act of 2018 ("ECRA") provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that

the export, reexport, and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled."  50 U.S.C. § 4811.

2.      To that end, ECRA grants the President the authority "(1) to control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information.  50 U.S.C. § 4812. ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

3.      Pursuant to that authority, the Department of Commerce ("DOC") reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774.  In particular, the EAR restrict the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States.  The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

4.      The most sensitive items subject to EAR controls were identified on the Commerce Control List, or "CCL," published at 15 C.F.R. part 774, Supp. No. 1.  Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which has export controls requirements depending on destination, end use, and end user.

5.      Pursuant to ECRA, "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this part or of any regulation, order, license, or other authorization issued under this part," and, "[a] person who willfully commits, willfully

attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall" be guilty of a crime.  50 U.S.C. § 4819.

6.      At all times relevant to this indictment, items categorized under ECCNs required a license for export based on a specific "reason for control," such as Regional Stability (RS), Anti-Terrorism (AT) and/or National Security (NS).  The "reason for control," in turn, determined the countries to which export of an item required a license.  Goods and technology controlled for RS, AT, and/or NS reasons required a license for export to countries including China.

7.      Neither the Defendant nor any agent of Tylex Tech LLC or Tyletech, or anyone else known or unknown to the Grand Jury, ever applied for, received, or possessed a license from the Department of Commerce to export any of the items listed in Count Two to China.

**The Charge**

On or about May 15, 2019, in the Western District of Texas, the District of New Jersey, and elsewhere, the Defendant,

**(1) XIAOJIAN TAO**

did knowingly and willfully export and cause the export from the United States to China the items listed below without having first obtained an export license from the Department of Commerce, and with knowledge that said items were destined for China, a controlled country for which exports of items are controlled for national security and regional stability reasons.

|    | Document Title | Tracking Number | Item | System | ECCN | Reason for Control |
|----|----------------|-----------------|------|--------|------|--------------------|
| 2a | Final Report: "Space-Based Communications" | TT-25 | E1062825 | N/A | 9E515 | NS RS AT |
| 2b | Acceptance Test Procedure for Pack Inlet Particle | TT-206 | E1064406 | CH-53K (U.S. Military Helicopter) | 9E610.a | NS RS |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Separator | | | | | |
| 2c | Qualification Test Report for APU Ejector Scavenge Assembly | TT-207 | E1064407 | CH-53K (U.S. Military Helicopter) | 9E610.a | NS RS |
| 2d | Acceptance Test Procedure for APU Fine Sand Mission Kit Filter | TT-208 | E1064408 | CH-53K (U.S. Military Helicopter) | 9E610.a | NS RS |
| 2e | Qualification Test Plan for Nose Gearbox | TT-209 | E1064867 | CH-53K (U.S. Military Helicopter) | 9E610.y | RS |
| 2f | Qualification Test Procedure for Main Gear Box Lube Filter | TT-210 | E1064868 | CH-53K (U.S. Military Helicopter) | 9E610.y | RS |
| 2g | Test Plan for ESM 411 Shadow UAV Fuel Pump | TT-211 | E1064869 | Shadow 200 (U.S. Military UAV) | 9E610.y | RS |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2h | Electromagnetic Interference Test Procedure for Supply Transfer Module | TT-212 | E1066743 | UH-60M (U.S. Military Helicopter) | 9E610.a | NS RS |
| 2i | Specification Control Drawing: Filter and Ozone Converter, On-Board Inert Gas Generation System | TT-214 | E1066747 | KC-46A (U.S. Military Aircraft) | 9E610.a | NS RS |

In violation of Title 50, United States Code, Sections 4819(2)(B) and 4811 *et seq.*

## **COUNT THREE**
### **[18 U.S.C. §§ 1343, 1349]**

The Introduction to this Indictment is hereby incorporated as if fully set forth.

## **Background**

1.      On or about October 31, 1994, Defendant Tao signed an employment contract with

COMPANY 1 that stated:

    a.      Employment Duties and Restrictions

i.   I shall devote my best efforts to furthering the business and interests of [COMPANY 1] to the extent that the needs of [COMPANY 1] and the servicing of its sponsors, clients, and other customers require. If I am a regular employee, I shall not engage or participate in other work or activities for compensation or profit without first obtaining the written approval of [COMPANY 1]'s President or his designated representative.

b.     Inventions and Discoveries

i.   Every invention, discovery, concept, design, and writing that I conceive, make, or produce during the term of this agreement, either alone or with others, and regardless whether during or outside my regular working hours and whether during periods of leave of absence or at other times, subject to Article 2.02, shall become the property of [COMPANY 1].

2.     Beginning on or about May 10, 1996, Defendant Tao stated he read and would abide by COMPANY 1's Standards of Conduct that stated:

Each staff member is obligated to reveal any existing or potential conflict of interest as soon as it is discovered. Examples would include … having a relationship with a business that might affect a staff member's objectivity.

Additionally, beginning on or about January 12, 2002, and for each year thereafter, the following was added to the above in the Standards of Conduct:

Each employee must remain free of any personal or financial conflict of interest in the performance of his or her duties, including outside activities that might hinder or distract the employee from the performance of his or her job or cause the employee to use [COMPANY 1]'s resources for other than [COMPANY 1] purposes.

Defendant Tao stated that he read and agreed to these terms each year from 2002 to 2019.

3.     In competition with COMPANY 1 and contrary to his employment contract with COMPANY 1 and the required COMPANY 1 Standards of Conduct, Tyletech was created by Defendant Tao and Defendant Lang on or about 1997 to provide engineering consulting, specialty sensors development, smart controllers development and prototyping, and experiment and test equipment development.

4.     Defendant Lang served as the named head of Tyletech. Defendant Tao's role was to provide the knowledge, consulting, and expertise to allow the Defendants to operate in direct competition with COMPANY 1.

### The Scheme

From on or about 1997, the exact date unknown, to on or about March 5, 2020, in the Western District of Texas and elsewhere, the Defendants,

**(1) XIAOJIAN TAO and**
**(2) YU LANG aka LAURA LONG**

and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree with each other, to devise and intended to devise a scheme to defraud COMPANY 1, to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and thereby caused to be transmitted by means of wire communication in interstate and foreign commerce communications and payments to the Defendants and their company, Tyletech, for the purpose of executing such scheme.

### Manner and Means

1.     Defendant Tao violated his employment contract by engaging or participating "in other work or activities for compensation or profit without first obtaining the written approval of [COMPANY 1]'s President or his designated representative" in direct competition with COMPANY 1 in order to defraud COMPANY 1.

2.     Defendant Tao falsely certified each year from on or about January 17, 2003 to on or about February 22, 2019 that he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict when in fact he continued to

work in direct competition with COMPANY 1 and earned outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

3.      Defendant Tao used COMPANY 1's resources to solicit business claiming the business was for COMPANY 1, when in truth Defendant Tao was soliciting and keeping these clients for the Defendants' personal business, Tyletech, which directly competed with COMPANY 1.  This conduct was contrary to his employment contract with COMPANY 1, and contrary to Defendant Tao's annual certification that he would follow COMPANY 1's required Standards of Conduct.

4.      Defendant Tao solicited business for the Defendants' personal business, Tyletech, from clients of COMPANY 1 even when Defendant Tao was sometimes serving as COMPANY 1's Project Manager with respect to projects for those same clients.  This conduct was contrary to Defendant Tao's employment contract with COMPANY 1 and contrary to Defendant Tao's annual certification that he would follow COMPANY 1's required Standards of Conduct.

5.      Defendant Yu Lang, a/k/a Laura Long, served as the named head of Tyletech to hide Defendant Tao's role of providing the knowledge, consulting, and expertise to allow Defendant Tao to conceal operating in direct competition with COMPANY 1, via Tyletech.

6.      To further the scheme, communications and payments traveled through interstate or foreign commerce.

7.      From on or about 2009 to on or about March 5, 2020, the Defendants profited and attempted to profit from this scheme.  Specifically, Defendant Tao collected his salary of approximately $1,546,929 from COMPANY 1 while at the same time earning gross receipts

from Tyletech of approximately $2,113,029  This conduct was in violation of his contract with COMPANY 1 and COMPANY 1's Standards of Conduct .

8.      The Defendants attempted to cover up their crimes by making materially false and fraudulent statements during their respective voluntary interviews with Federal Bureau of Investigation agents.

### Overt Acts

In furtherance of the conspiracy and to accomplish the objects thereof, the Defendants, together with others known and unknown to the Grand Jury, committed and caused to be committed, among others, one or more of the following acts, in the Western District of Texas and elsewhere:

1.      On or about June 4, 1997, Defendant Tao and Defendant Lang created Tyletech to provide engineering consulting, specialty sensors development, smart controllers development and prototyping, and experiment and test equipment development in competition with COMPANY 1 and contrary to Defendant Tao's employment contract with COMPANY 1 and the required COMPANY 1 Standards of Conduct.

2.      On or about February 2, 2009, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct and Conflict of Interest policy by immediately notifying his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict when in fact he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

3.      On or about October 16, 2009, Defendant Lang established a business checking account titled Yu LANG DBA Tyletech.

4.      On or about February 4, 2010, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict when in fact he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

5.      On or about July 26, 2010, while in China representing COMPANY 1 and at COMPANY 1's expense, Defendant Tao discussed providing services and testing to COMPANY 7 by Tyletech. On or about May 2011, the Defendant invited representatives of COMPANY 7 to COMPANY 1 allegedly to develop business for COMPANY 1 at COMPANY 1's expense and using COMPANY 1 for visa sponsorship. In reality, however, from on or about March 27, 2012, to on about March 2, 2017, the Defendants and Tyletech defrauded COMPANY 1 and received approximately $188,691 from COMPANY 7 while COMPANY 1 received no business from COMPANY 7.

6.      On or about December 30, 2011, Defendant Lang established another business checking account titled, "Yu LANG Tyletech."

7.      On or about December 21, 2010, in order to further defraud COMPANY 1, Defendant Tao entered into a non-disclosure agreement with COMPANY 3 to provide consulting and new product development after previously working on projects for COMPANY 3 during approximately October 2001 on behalf of his employer, COMPANY 1.

8.      On or about February 9, 2011, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of

any potential conflict when in fact he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

9.  From on or about February 1, 2012, to on or about November 18, 2014, the Defendants via Tyletech were paid approximately $52,685 by COMPANY 3 for services Tyletech provided in competition with COMPANY 1 contrary to Defendant Tao's employment contract and COMPANY 1's Standards of Conduct.

10.  On or about February 13, 2012, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict.   In fact, however, he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

11.  On or about late April 2012, Defendant Tao, representing COMPANY 1, hosted a visitor from COMPANY 8 using COMPANY 1 for visa sponsorship to allegedly to develop business for COMPANY 1. Instead of developing business for COMPANY 1, however, Defendant Tao solicited COMPANY 8's business for Tyletech and thereby defrauded COMPANY 1.  From on or about April 2012, to on or about October 2012, the Defendants and Tyletech received approximately $49,965 from COMPANY 8 while COMPANY 1 received no business from COMPANY 8.  Because COMPANY 8 was located in China and the Defendants lived in the Western District of Texas, email communications to and from and all the electronic payments to the Defendants traveled in interstate and foreign commerce via wire communications.

12.  From on or about July 2012 through on or about November 2018, Defendant Tao and Tyletech did business with the Chinese COMPANY 6 and were paid approximately

$953,185.  This was during the same timeframe COMPANY 1 had active business with COMPANY 6, some of which Defendant Tao worked on as the COMPANY 1 project manager. Because COMPANY 6 was located in China and the Defendants lived in the Western District of Texas, the Defendants' email communications with COMPANY 6 and all the electronic payments the Defendants received from COMPANY 6 traveled in interstate and foreign commerce via wire communications.

13.     On or about February 14, 2013, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict. In fact, however, he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

14.     On or about January 15, 2013, Defendant Tao invited representatives from COMPANY 5 in China to COMPANY 1 under the guise of developing business for COMPANY 1.  COMPANY 1 thus paid for COMPANY 5's representatives' local transportation and meal expenses.

15.     From on or about April 2013 to on or about April 2018, Defendant Tao and Tyletech engaged in business with COMPANY 5 to the exclusion of COMPANY 1 and without COMPANY 1's knowledge. From on or about April 2013 to on or about December 2019, Tyletech was paid approximately $768,605 by COMPANY 5 for those business dealings.  Also, during this timeframe, and incorporated in the above referenced total, COMPANY 5 paid the Defendants, via Tyletech, a monthly payment amount of approximately $7,980 beginning April 2014 and continuing through December 2019.  Because this company was located in China and the defendants lived in the Western District of Texas, the Defendants' email communications

with COMPANY 5 and all the electronic payments the Defendants received from COMPANY 5 traveled in interstate and foreign commerce via wire communications.

16.     On or about February 17, 2014, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict when in fact he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

17.     On or about February 18, 2015, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict. In fact, however, he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

18.     On or about February 19, 2016, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict. In fact, however, he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

19.     On or about October 25, 2016, Defendant Tao began engaging in business with COMPANY 2 on behalf of Tyletech regarding pump controllers. Defendant Lang signed a confidentiality agreement between Tyletech and COMPANY 2 through the use of email, which was transmitted between the Western District of Texas and Michigan. Defendant Tao became familiar with COMPANY 2 through Tao's work on behalf of his employer, COMPANY 1, on or about March 25, 2000.

20.     On or about February 20, 2017, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict.   In fact, however, he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

21.     On or about June 21, 2017, COMPANY 1 hosted two representatives from COMPANY 5. Defendant Tao invited COMPANY 5's representatives under the guise of allegedly developing business for COMPANY 1. Following this visit by COMPANY 5's representatives to COMPANY 1, Defendant Tao  and Tyletech entered into a three-year agreement to provide services to COMPANY 5. These services were provided by Tyletech in competition with and to the exclusion of COMPANY 1 and in violation of Defendant Tao's employment contract with COMPANY 1 and COMPANY 1's Standards of Conduct.

22.     From on or about September 2017 to on or about June 2019, Defendant Tao and Tyletech did business with COMPANY 4 and Tyletech was paid approximately $74,932 for those business dealings. This was during the same timeframe that COMPANY 1 had active business with COMPANY 4, some of which Defendant Tao worked on as COMPANY 1's project manager. Because COMPANY 4 was located outside the State of Texas and the defendants lived in the Western District of Texas, the Defendants' email communications with COMPANY 4 and all of COMPANY 4's electronic payments to the Defendants traveled in interstate via wire communications.

23.     On or about February 21, 2018, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of

any potential conflict. In fact, however, he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

24.     On or about late Summer or early Fall 2018, COMPANY 2 contacted COMPANY 1 requesting a quote for work. In response to this request, Defendant Tao provided two quotes to COMPANY 2: one quote from COMPANY 1 for testing and one quote from Tyletech for the intellectual property rights to the controller needed for the testing. This conduct was in violation of Defendant Tao's employment contract with COMPANY 1 and COMPANY 1's Standards of Conduct. These communications were transmitted via email between the Western District of Texas and Michigan. The Defendants profited from COMPANY 2's payment of $24,965.

25.     On or about February 22, 2019, Defendant Tao falsely certified he would abide by COMPANY 1's Standards of Conduct, Conflict of Interest policy and immediately notify his immediate supervisor or COMPANY 1's Compliance Officer of any potential conflict. In fact, however, he continued to work and earn outside compensation in order to defraud COMPANY 1 and take potential clients from COMPANY 1.

26.     On or about June 17, 2019, the Defendants profited by receiving a check initiated by email communications, via Tyletech, from COMPANY 2 in Michigan in the amount of $24,965.00.

27.     On or about November 26, 2019, Defendant Tao made false statements to the Federal Bureau of Investigation in order to conceal the Defendants' income from Tyletech and the scheme to defraud COMPANY 1.

28.     On or about November 26, 2019, Defendant Lang made false statements to the Federal Bureau of Investigation to hide Defendant Tao's connection to the Defendants outside

income from Tyletech in order to conceal the Defendants' scheme to defraud COMPANY 1.

All in violation of Title 18, United States Code, Sections 1343 and 1349.

## COUNTS FOUR through TWELVE
### [18 U.S.C. § 1343]

The Introduction to Count One and the Background, Manner and Means, and Overt

Acts of Count Three are hereby incorporated as if fully set forth.

### Wire Fraud

On or about each of the dates set forth below, in the Western District of Texas and

elsewhere, Defendants

### (1) XIAOJIAN TAO
### (2) YU LANG aka LAURA LONG

for the purpose of executing the scheme described above, to obtain money and property by

means of materially false and fraudulent pretenses, representations and promises caused to be

transmitted by means of wire communication in interstate and foreign commerce the signals

for the purpose of executing such scheme described below for each count, each transmission

constituting a separate count:

| Count | Date | Description |
|---|---|---|
| 4 | 2/21/2017 | Electronic payment from COMPANY 5 for $49,970.00 |
| 5 | 3/2/2017 | Electronic payment from COMPANY 7 for $37,500.00 |
| 6 | 9/11/2017 | Electronic payment from COMPANY 4 for $8,871.00 |
| 7 | 2/28/2018 | Electronic payment from COMPANY 5 for $12,595.66 |
| 8 | 9/13/2018 | Electronic payment from COMPANY 4 for $17,398.00 |
| 9 | 11/27/2018 | Electronic payment from COMPANY 6 for $75,228.00 |
| 10 | 2/27/2019 | Electronic payment from COMPANY 4 for $20,456 |

| 11 | 6/14/2019 | Electronic payment from COMPANY 5 for $7,980.00 |
| 12 | 6/17/2019 | Check initiated by email for payment from COMPANY 2 for $24,965.00 |

All in violation of Title 18, United States Code, Section 1343.

## COUNT THIRTEEN
### [18 U.S.C. §371]

From on or about April 7, 2013, to on or about April 15, 2020, in the Western District of Texas and elsewhere, the Defendants,

### (1) XIAOJIAN TAO
### (2) YU LANG aka LAURA LONG

and others, did knowingly and willfully combine, conspire, confederate and agree with each other, to devise and intended to devise a scheme to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, and collection of the revenue: namely, income taxes, by omitting gross receipts from their tax returns.

### Manner and Means

The Defendants, **Xiaojian Tao and Yu Lang, a/k/a Laura Long,** residents of Bexar County, Texas, did willfully make and subscribe a Form 1040 Married Filing Jointly Individual Income Tax Return for the tax years 2012 through 2019, which were each verified by a written declaration that each was made under the penalties of perjury and which both **Xiaojian Tao and Yu Lang, a/k/a Laura Long** did not believe to be true and correct as to every material matter. Each Form 1040 Individual Income Tax Return, which was electronically filed with the Director, Internal Revenue Service, omitted from Schedule C gross receipts for the said tax year, whereas,

as **Xiaojian Tao and Yu Lang, a/k/a Laura Long** then and there knew these gross receipts had to be reported to the Internal Revenue Service.

### Overt Acts

In furtherance of the conspiracy and to accomplish the objects thereof, the Defendants, together with others known and unknown to the Grand Jury, committed and caused to be committed, among others, one or more of the following acts, in the Western District of Texas and elsewhere:

1.      On or about April 7, 2013, the Defendants electronically filed a materially false tax return, verified by a written declaration that it was made under the penalties of perjury, which the Defendants did not believe to be true and correct as to every material matter, in that the Defendants' 2012 Form 1040 Individual Income Tax Return omitted gross receipts from Schedule C for that tax year in the amount of $158,462.

2.      On or about April 5, 2014, the Defendants electronically filed a materially false tax return, verified by a written declaration that it was made under the penalties of perjury, which the Defendants did not believe to be true and correct as to every material matter in that the Defendants' 2013 Form 1040 Individual Income Tax Return omitted gross receipts from Schedule C for that tax year in the amount of $557,733.

3.      On or about April 12, 2015, the Defendants electronically filed a materially false tax return, verified by a written declaration that it was made under the penalties of perjury, which the Defendants did not believe to be true and correct as to every material matter in that the Defendants' 2014 Form 1040 Individual Income Tax Return omitted gross receipts from Schedule C for that tax year in the amount of $345,425.

4.      On or about April 16, 2016, the Defendants electronically filed a materially false tax return, verified by a written declaration that it was made under the penalties of perjury, which the Defendants did not believe to be true and correct as to every material matter in that the Defendants' 2015 Form 1040 Individual Income Tax Return omitted gross receipts from Schedule C for that tax year in the amount of $567,257.

5.      On or about April 17, 2017, the Defendants electronically filed a materially false tax return, verified by a written declaration that it was made under the penalties of perjury, which the Defendants did not believe to be true and correct as to every material matter in that the Defendants' 2016 Form 1040 Individual Income Tax Return omitted gross receipts from Schedule C for that tax year in the amount of $194,844.

6.      On or about April 7, 2018, the Defendants electronically filed a materially false tax return, verified by a written declaration that it was made under the penalties of perjury, which the Defendants did not believe to be true and correct as to every material matter in that the Defendants' 2017 Form 1040 Individual Income Tax Return omitted gross receipts from Schedule C for that tax year in the amount of $259,602.

7.      On or about April 14, 2019, the Defendants electronically filed a materially false tax return, verified by a written declaration that it was made under the penalties of perjury, which the Defendants did not believe to be true and correct as to every material matter in that the Defendants' 2018 Form 1040 Individual Income Tax Return omitted gross receipts from Schedule C for that tax year in the amount of $236,641.

8.      On or about October 16, 2020, the Defendants electronically filed a materially false tax return, verified by a written declaration that it was made under the penalties of perjury, which the Defendants did not believe to be true and correct as to every material matter in that the

Defendants' 2019 Form 1040 Individual Income Tax Return omitted gross receipts from Schedule C for that tax year in the amount of $122,528.

In violation of Title 18, United States Code, Section 371.

**COUNTS FOURTEEN through EIGHTEEN**
**[26 U.S.C. §7206(1)]**

That on or about the following dates, in the Western District of Texas and elsewhere, the Defendants,

**(1) XIAOJIAN TAO**
**(2) YU LANG aka LAURA LONG**

residents of Bexar County, Texas, did willfully make and subscribe a Form 1040 Married Filing Jointly Individual Income Tax Return, which was verified by a written declaration that it was made under the penalties of perjury and which both **Xiaojian Tao and Yu Lang, a/k/a/ Laura Long** did not believe to be true and correct as to every material matter. That Form 1040 Individual Income Tax Return**,** which was electronically filed with the Director, Internal Revenue Service, omitted gross receipts from Schedule C for the said tax year, whereas, as **Xiaojian Tao and Yu Lang, a/k/a Laura Long** then and there knew these gross receipts had to be reported to the Internal Revenue Service.

| Count | Date Filed | Tax Year | Understatement Gross Receipts |
|-------|-----------|----------|-------------------------------|
| 14 | April 16, 2016 | 2015 | $567,257 |
| 15 | April 17, 2017 | 2016 | $194,844 |
| 16 | April 7, 2018 | 2017 | $259,602 |
| 17 | April 14, 2019 | 2018 | $236,641 |
| 18 | October 16, 2020 | 2019 | $122,528 |

In violation of Title 26, United States Code, Section 7206(1).

## COUNT NINETEEN

### [50 U.S.C. § 4819(a)(2)(F)(i)]

On or about November 26, 2019, in the Western District of Texas, the Defendant,

### (1)XIOAJIAN TAO

in a matter within the jurisdiction of United States Department of Justice, Federal Bureau of Investigation, an agency and department of the United States and in relation to a criminal investigation regarding Export Administration Regulations and the Export Control Reform Act, the Defendant did knowingly and willfully make a materially false and misleading representation, in his responses to the following questions:

Agent: But, like from, when you were a junior engineer to, to your current position, uh international travel whether it's to Italy, Germany, China, have you ever traveled with ITAR information,  export control information?

Tao:     I don't deal with that.

Agent: Okay. Um,  so you're saying no to ITAR?

Tao:     Correct.

Agent: And then no to uh export control?

Tao:     Correct.

In violation of Title 50, United States Code, Section 4819(a)(2)(F)(i).

## COUNT TWENTY
### [18 U.S.C. § 1001]

On or about November 26, 2019, in the Western District of Texas, the Defendant,

### (1) XIOAJIAN TAO

in a matter within the jurisdiction of United States Department of Justice, Federal Bureau of

Investigation, an agency and department of the United States and in relation to a criminal investigation, the Defendant did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation, in his responses to the following questions:

Agent: You said that you don't receive any salary or payments unrelated to [COMPANY 1]. Like any outside employment or outside payments from like China or anyplace else?

Tao: Yeah.

Agent: Is, is that correct?

Tao: That's correct.

In violation of Title 18, United States Code, Section 1001.

## COUNT TWENTY-ONE
### [18 U.S.C. § 1001]

On or about November 26, 2019, in the Western District of Texas, the Defendant,

### (2) YU LANG aka LAURA LONG

in a matter within the jurisdiction of United States Department of Justice, Federal Bureau of Investigation, an agency and department of the United States and in relation to a criminal investigation, the Defendant did knowingly and willfully make false, fraudulent, and fictitious material statements and representations, in her responses to the following questions:

Agent: And you mentioned earlier uhm is you husband involved with the company [Tyletech]?

Lang:  No….

Agent: Is your husband involved with Tyletech?

Lang:  No….

Agent: Does your husband…does he… deal with your company [Tyletech]? Does he work… for your company?

Lang:  No.

Agent: Does he… work with your company [Tyletech]?

Lang:  No.

In violation of Title 18, United States Code, Section 1001.

## COUNT TWENTY-TWO
### [18 U.S.C. § 1001]

On or about November 26, 2019, in the Western District of Texas, the Defendant,

### (2) YU LANG aka LAURA LONG

in a matter within the jurisdiction of United States Department of Justice, Federal Bureau of Investigation, an agency and department of the United States and in relation to a criminal investigation, the Defendant did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation, in her responses to the following questions:

Agent: You pay taxes?

Lang:  Yeah.

Agent:  Ok.

Lang:  I'm easily…even we don't pay. The company pay. The-the…this company pay.

Agent 2:  [COMPANY 5]?

Lang:  Yeah.

Agent: [COMPANY 5]-like they pay the money to the United States Government?

Lang:  Yeah. We think…because…yeah they pay…all…we pay.

Agent: Ok.

Lang:  They should pay that.


In violation of Title 18, United States Code, Section 1001.

## <u>NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE</u>
[*See* FED. R. CRIM. P. 32.2]

### I.
### <u>Fraud Violations and Forfeiture Statutes</u>
[18 U.S.C. §§ 1343 and 1349,
subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C),
made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c)]

As a result of the foregoing criminal violations set forth in Counts Three through Twelve, the

United States gives notice to the Defendant of its intent to seek the forfeiture of property, including

any items listed below, upon conviction and as a part of sentence pursuant to FED. R. CRIM. P. 32.2

and 18 U.S.C. § 981(a)(1)(C), made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c),

which states:

**18 U.S.C. § 981.  Civil Forfeiture**
**(a)(1)**   The following property is subject to forfeiture to the United States:
\* \* \*
**(C)** Any property, real or personal, which constitutes or is derived from proceeds
traceable to . . . any offense constituting "*specified unlawful activity*" (as defined in
section 1956(c)(7) of this title), or a conspiracy to commit such offense.

↓

**§ 1956.  Laundering of monetary instruments**
\* \* \*
**(c)** As used in this section—
\* \* \*
**(7)** the term "*specified unlawful activity*" means—
**(A)** any act or activity constituting an offense listed in section *1961(1)* of this title
. . . .

**§ 1961.  Definitions**
As used in this chapter—
**(1)** "racketeering activity" means . . . (B) any act which is indictable under any
of the following provisions of *title 18, United States Code*: . . . section *1343
(relating to wire fraud)* . . . .

This Notice of Demand for Forfeiture includes but is not limited to the following items.

## II.
## Money Judgment

**Money Judgment:** A sum of money equal to the proceeds traceable to the fraud violations for which the Defendant is liable.

### III.
### Substitute Property

If any proceeds from the fraud violations, as a result of any act or omission of the

Defendant—

    **(A)** cannot be located upon the exercise of due diligence;
    **(B)** has been transferred or sold to, or deposited with, a third party;
    **(C)** has been placed beyond the jurisdiction of the court;
    **(D)** has been substantially diminished in value; or
    **(E)** has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States to seek the forfeiture of any other property of the Defendant, up

to the value of the money judgment, as substitute property pursuant to Title 21 U.S.C. § 853(p)

and FED. R. CRIM. P. 32.2(e).

A TRUE BILL



FOREPERSON OF THE GRAND JURY

ASHLEY C. HOFF
United States Attorney

FOR MARK ROOMBERG
Assistant United States Attorney

FOR WILLIAM R. HARRIS
Assistant United States Attorney