UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Cause No.: SA-22-CR-170-XR** |
| | § | |
| **XIAOJIAN TAO (1),** | § | |
| **YU LANG (2),** | § | |

**OPPOSED MOTION FOR
PROTECTIVE ORDER GOVERNING DISCOVERY**

COMES NOW, the United States, by its undersigned Assistant United States Attorney, and hereby files its opposed Motion for Protective Order Governing Discovery in order to protect export-controlled information, trade secrets, and proprietary information obtained from and belonging to numerous companies, and to provide required discovery to defense counsel and defendants, and states:

**Background**

1.      Defendant Tao is charged in Count One, Illegal Export of Defense Articles without a License in violation of 22 U.S.C. § 2778(c), Count Two, Unlawful Export of Commerce Controlled Goods in violation of 50 U.S.C. § 4819, Counts Three through Twelve, Wire Fraud conspiracy and substantive wire fraud counts in violation of 18 U.S.C. §§ 1349 and 1343, Count Thirteen, Conspiracy to Impede and Impair the IRS in violation of 18 U.S.C. § 371, Counts Fourteen through Eighteen, False Statements on Income Tax Return in violation of 26 U.S.C. § 7206(1), Count Nineteen, ECRA False Statement in violation of 50 U.S.C. § 4819, and Count Twenty, False Statements to Federal Agencies and Agent in violation of 18 U.S.C. §§ 1001(a)(2) and (a)(3).

1

2.      Defendant Lang is charged in Counts Three through Twelve, Wire Fraud conspiracy and substantive wire fraud counts in violation of 18 U.S.C. §§ 1349 and 1343, Count Thirteen, Conspiracy to Impede and Impair the IRS in violation of 18 U.S.C. § 371, Counts Fourteen through Eighteen, False Statements on Income Tax Return in violation of 26 U.S.C. § 7206(1), and Counts Twenty-One and Twenty-Two, False Statements to Federal Agencies and Agent, 18 U.S.C. §§ 1001(a)(2) and (a)(3).

**Export Control Violations**

3.      Defendant Tao worked as an engineer for Southwest Research Institute (SwRI) from 1994 until his termination in March 2020. SwRI is a nonprofit, applied research and development (R&D) organization that provides contract research and development services to industrial and government clients in the United States and abroad.

4.      Tao's field of research at SwRI was in fuel systems and contamination control research, where he worked on projects that included the design, development and testing of automotive air, fuel, and oil filters and filtration systems, industrial filtration and process control, and engine component wear studies using surface layer activation and bulk radioactive tracer techniques.  Many companies came to SwRI with their projects. Tao also served as a member of SWRI's Internal Research and Development (IR&D) committee. The IR&D committee controls all of SWRI's internal research and development projects and determines which projects will be funded and pursued, and which ones will not.  Tao's position on the IR&D committee permitted Tao unrestricted access to the latest unclassified innovations for which SWRI scientists and engineers sought approval and funding.  Some of these projects may contain proprietary information and some may be subject to export control restrictions requiring a license before being exported from the United States.

5.      Proprietary, trade secret, confidential and export-controlled items encompass more

than just physical systems or parts. These items also include, but are not limited to plans, proposals, data, test results, schematics, drawings, and pictures that the government will provide in discovery to the defendant. As the government intends to prove at trial, these latter items could be used by adversaries or competitors to replicate sensitive or proprietary technology. Further, if these items are passed on to foreign individuals or entities without the requisite licenses from the United States government, our adversaries can gain an advantage to the detriment of American national security.

6.    Defendant Tao was well aware of his obligation to protect export-controlled items. SwRI required each employee to be trained in the protection of export-controlled, proprietary, trade secret and confidential information at least on an annual basis and for the employee to confirm he received the training. In his recorded, non-custodial, voluntary interview with the FBI, Tao stated that he was familiar with the handling of export-controlled, proprietary, trade secret and confidential information and would receive such training from SwRI once or twice a year. Tao also told the FBI agents that he himself made sure each item he sent out for his wife's Tyletech business was not an export-controlled item. Furthermore, after Tao informed SwRI he would be traveling to China in May 2019, SwRI sent Tao an email reminding him not to take any SwRI electronics if they may contain any export-controlled information without getting the requisite approvals from SwRI and the government. Tao nevertheless  brought his SwRI laptop with him to China, which contained several export-controlled documents. He did not request or receive permission from SwRI, or the United States Departments of State or Commerce to do so.

7.    Specifically, Defendant Tao took the plans and test results for one State Department-controlled defense article as charged in Count One and approximately 14 Commerce-controlled dual use items, nine of which are charged in Count 2. Defendant Tao was aware that he had these export-controlled items on his laptop as they were saved in particular subfolders and/or

he had specific email conversations regarding a particular item. These items also had specific markings on them putting the defendant on notice that they were export-controlled.

### Wire Fraud Conspiracy and Substantive Wire Fraud Counts

8.      The defendants are charged with Wire Fraud conspiracy and substantive counts of Wire Fraud. In Defendant Tao's 1994 contractual agreement with SwRI he agreed that he "shall not engage or participate in other work or activities for compensation or profit without first obtaining the written approval of SwRI's President or his designated representative. Tao further agreed in his contract that "[e]very invention, discovery, concept, design, and writing that I conceive, make, or produce during the term of this agreement, either alone or with others, and regardless whether during or outside my regular working hours and whether during periods of leave of absence or at other times" belonged to SwRI. Tao also certified on an annual basis to the required SwRI Standards of Conduct that "[e]ach staff member is obligated to reveal any existing or potential conflict of interest as soon as it is discovered." Tao also certified that he would follow that Standards of Conduct requiring "[e]ach employee must remain free of any personal or financial conflict of interest in the performance of his or her duties, including outside activities that might hinder or distract the employee from the performance of his or her job or cause the employee to use SwRI's resources for other than SwRI purposes."

9.      Despite these agreements, Defendant Tao and Defendant Lang formed Tyletech LLC (Tyletech) on or about 1997 to provide engineering consulting, specialty sensors development, smart controllers development and prototyping, and experiment and test equipment development. Defendant Lang served as the named head of Tyletech. Defendant Tao's role was to provide the knowledge, consulting, and expertise to allow the Defendants to operate in direct competition with SwRI. Initially, Defendant Tao was the named Vice President until the

defendants removed Tao's name from the business. Yet despite this superficial change, Tao continued to be deeply involved in the business, providing all the substantive engineering consulting and income-generating functions for Tyletech.

10.     Tao generated the income for Tyletech by two main methods. First, Tao used the connections with SwRI clients that he formed through his work on SwRI projects to solicit these clients to use Tyletech (rather than SwRI) to generate new and separate engineering projects. Tao never informed SwRI that he was soliciting business for Tyletech in direct competition with SwRI. Sometimes Tao would be working with and paid by these companies for the Tyletech projects while serving as the SwRI project manager for the SwRI-contracted projects. Second, Tao would use SwRI resources to bring in potential clients from companies in China to the United States under the guise of developing new clients for SwRI. Tao, however, was actually developing these Chinese companies as clients for Tyletech. Tao never told SwRI of his outside work that was in direct competition to SwRI and at SwRI's expense.

11.     In order to cover up the scheme, when interviewed by the FBI, Defendant Lang falsely claimed repeatedly that Defendant Tao had nothing to do with Tyletech's business. Defendant Tao initially denied providing any services for Tyletech, but after being confronted, Tao stated he helped sell parts to Chinese companies for Tyletech and provided some consulting work and seminars for Tyletech companies.

12.     The defendants profited over $2.1 million from their Tyletech business that was in direct competition to SwRI and contrary to his materially false and fraudulent representations and statements that he made on his employment contract and annual Standards of Conduct certifications. All of the payments that were made traveled through interstate or foreign commerce or emails were sent through interstate commerce instructing payments be made to the

defendants.

### Tax Fraud Conspiracy and Substantive False Tax Returns Counts

13.    On their 2015 to 2019 Form 1040 tax returns, the defendants reported very minimal amounts of gross receipts for Tyletech on their Schedule C. The defendants failed to report gross receipts for Tyletech in amounts ranging from $567,257 on their 2015 Form 1040 to $122,528 on their 2019 Form 1040.

14,    In her interview with the FBI, Defendant Lang claimed that one of the half-dozen companies Tyletech had contracts with, JTR Automotives in China, would pay the IRS taxes for the defendants. This statement, however, directly contradicts the JTR Automotives contract signed by Lang stating Tyletech was responsible for all American taxes. This, of course, begs the question regarding not reporting the income the defendants generated with Tyletech from the companies' other clients.

### False Statements

15.    In Count 19, Defendant Tao is charged with making a materially false statement to the FBI regarding an export matter during his voluntary, non-custodial interview. The defendant falsely stated he never traveled with  ITAR information or export control information. As noted with respect to Counts One and Two, however, the defendant traveled to China in May 2019 with both ITAR-controlled information as well as EAR-controlled export information requiring State or Commerce Department licenses, respectively. Again, the information was stored on his SwRI computer in specific sub-folders relating to the projects and/or Tao had specific emails regarding these projects when he went to China. Tao admitted he received semi-annual and/or annual training on export controlled matters from SwRI and even checked Tyletech shipments for export controls before shipping them to China.

16.     In Count 20, Defendant Tao is charged with making materially false statements to the FBI when he told the FBI that he falsely stated "Correct" to the question about receiving any "salary or payments unrelated to SwRI. Like any outside employment or outside payments from like China or anyplace else." The evidence will show that Tao received gross receipts amounting to $2.1 million from the engineering work he did for Tyletech. The evidence will show Defendant Lang handled the administrative side of the business and she stated she did not have the knowledge to provide the engineering income-generating activity for Tyletech.

17.     In Count 21, Defendant Lang is charged with making materially false statements to the FBI in her voluntary, non-custodial interview that her husband, Defendant Tao, was not involved with, work with, or work for Tyletech. Again, the evidence will show that the defendant provided all engineering income-generating activity for Tyletech amounting to $2.1 million. The evidence will show Defendant Lang handled the administrative side of the business and she stated she did not have the knowledge to provide the engineering income-generating activity for Tyletech.

18.     In Count 22, Defendant Lang is charged with making a materially false statement to the FBI when she told them in her voluntary, non-custodial interview that JTR Automotives paid the American taxes on their business with Tyletech. The JTR Automotives contract, that Lang herself signed, stated that Tyletech was responsible for paying the American taxes.

**Proposed Protective Order**

**Discovery Produced**

19.     The government has produced to the defendants' attorneys the defendants' statements, both recordings and transcripts, the defendants' NCIC criminal histories, the defendants' tax returns, and the search warrants and affidavits that were executed in this case.

**<u>Discovery Available for Production for which this Protective Order Is Sought</u>**

20.      The government is ready to make available to the defense a large quantity of discovery that encompasses not only what is required under Rule 16, *Brady* and *Giglio* and its progeny, but also early Jencks material in the form of agent reports, attachments, and some rough notes. The materials encompass approximately 8.5 terabytes of computer images, to include Defendant Tao's SwRI-assigned laptop and other electronics as well as images from the electronics seized in the execution of the search warrant at the defendants' home. Another 4.5 gigabytes of information contain the remaining discovery including agent reports, grand jury subpoenaed records, tax returns, criminal histories, business records, and expert witness reports.

**<u>Limited "Materials" for which Protective Order Is Sought</u>**

21.      Because of the necessity to protect SwRI and other companies' trade secret, proprietary and confidential information that may also contain export-controlled information that can only be released to a foreign individual or entity with United States government approval, there must be a robust protective order in place to prevent the further spread of this information to domestic competitors and overseas competitors and adversaries.

22.      The parties have tried for several weeks to come up with a mutually agreeable protective order. The government has made many changes suggested by defense counsel to the original proposed order but the parties have been unable arrive at a final mutually agreeable protective order.

23.      The government has offered the attached protective order that would define the items requiring protection as

> **"Materials" for purposes of this discovery order are defined as any potentially confidential, export-controlled, trade secrets, and/or proprietary information from any and all companies or entities, including but not limited to plans, proposals, data, test results, schematics, drawings, pictures that the**

**government provides in discovery to the defendant.** Other discovery provided by the government not falling under this definition of "Materials" are not covered by this protective order.

24.     The government's proposed protective order would allow the defendant to view all of the discovery. However, like discovery limitations in other criminal cases, such as child pornography cases, the defendants would not be allowed to have copies of any discovery falling under the definition of "Materials;" (the defendants would be allowed to possess copies of all other discovery). Given the need to provide defense counsel with unedited images of the electronics, which make up the bulk of the discovery, as well as the large amount of "Materials" Defendant Tao saved, the government cannot segregate the "Materials" from the remainder of the discovery and it would be up to defense counsel to determine the circumstances in which the defendants could possess copies of certain discovery.

25.     The government has informed defense counsel, as set forth in the definition of "Sensitive Information" in the attached Proposed Protective Order, that the only subset of "Materials" the government intends to use in its Case-in-Chief would be the 10 specific documents charged in Counts One and Two of the Indictment. The government will be requesting that redacted copies of these 10 exhibits be made part of the public record and unredacted copies of these exhibits be shown to the witnesses, the Court, the jury, and the parties and be kept out of the public record as to prevent the further dissemination of these export-controlled and proprietary documents.

26.     To allay some of the defense counsel's objections to this proposal based on their offices being in Washington, D.C., the government has also agreed to make available a room in the United States Attorney's Office where the defendants can privately view the "Materials" on a computer and have a hard-line telephone available to consult with their attorneys. The defendants would not be allowed to bring in their cellular phones so as to prevent taking screen shots of the

"Materials."

27.     Additionally, the government also agreed that defense counsel could video conference with the defendants and screen-share documents as long as counsel reminded the defendants that they could not record or photograph the "Materials."

28.     Defense counsel stated to the government that they believe it is necessary for the defendants to have copies and unsupervised access to all discovery, including "Materials." The government believes that since Defendant Tao has already shown his propensity to mishandle export-controlled materials (despite his admitted knowledge, training, and warnings against doing so), as well as his willingness to put his greed over his contractual duties to SwRI, it is necessary to limit the defendants' ability to have copies of items that fall within the definition of "Materials."

WHEREFORE, the United States respectfully requests that this honorable Court approve the attached proposed Protective Order Governing Discovery.

Respectfully submitted,

ASHLEY HOFF
UNITED STATES ATTORNEY

   /s/
MARK T. ROOMBERG
Assistant United States Attorney
Texas Bar No. 24062266
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7100

   /s/
WILLIAM R. HARRIS
Assistant United States Attorney
Ohio Bar No. 0017818
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7100

CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of June 2022, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to the following CM/ECF participant:

Attorneys for Xiaojian Tao
Peter Zeidenberg
Apeksha Vora

Attorneys for Yu Lang
David Schertler
Noah Jackson Cherry
John T. Floyd, III
Christopher M. Choate

_/s/_____
MARK T. ROOMBERG
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Cause No.: SA-22-CR-170-XR** |
| | § | |
| **XIAOJIAN TAO (1),** | § | |
| **YU LANG (2),** | § | |

<u>**PROTECTIVE ORDER GOVERNING DISCOVERY**</u>

Upon the motion of the government, pursuant to Fed. R. Crim. P. 16(d), it is hereby
ORDERED:

1.      "Materials" for purposes of this discovery order are defined as any potentially
confidential, export-controlled, trade secrets, and/or proprietary information from any and all
companies or entities, including but not limited to plans, proposals, data, test results, schematics,
drawings, pictures that the government provides in discovery to the defendant. Other discovery
provided by the government not falling under this definition of "Materials" are not covered by this
protective order.

2.      All persons to whom any part of the Materials are provided or disclosed must receive
a copy of this protective order ("Order") and sign an acknowledgement form ("Acknowledgment")
that he/she has reviewed the Protective order and agrees to be bound by its terms and consents to
the jurisdiction of this Court for the purpose of any proceedings relating to the performance under,
compliance with, or violation of this Order.

3.      Defendant and defendant's counsel shall not disclose the Materials or their contents
directly or indirectly to any person or entity other than to persons employed to assist in the defense,
retained experts, persons who are interviewed as potential witnesses, and counsel for potential

1

witnesses who receive a copy of this protective order and sign the Acknowledgment (collectively, "Authorized Persons").  Potential witnesses and their counsel may be shown copies of the Materials as necessary to prepare the defense, but these potential witnesses may not retain copies without prior permission of the United States.  Defense counsel shall maintain a list of persons to whom Materials are disclosed and retain a copy of each Acknowledgement described above.

4.      The Materials and their contents shall not be disclosed either directly or indirectly to any foreign national or entity outside of the United States without prior authorization from the United States.  To the extent the Materials are owned by or pertain to a private company or organization, those Materials and their contents shall not be shown to any competitor or potential competitor of that company or organization (except the defendant) without prior authorization from the United States, the Court, or the owner of the information.

5.      Defendant, defendant's counsel, and Authorized Persons shall not copy or reproduce any of the Materials, except in order to provide copies of the Materials for use in connection with this case by defendant, defendant's counsel, and Authorized Persons. Such copies and reproductions shall be treated in the same manner as the original materials. No such materials in the unredacted versions, or the information contained therein, may be copied, except for the direct use of counsel for the defendant and persons employed or retained by the defendant; all such copies shall be stored in a secure location as set forth below and all such copies shall be returned to the government at the conclusion of the case. Further, no such materials, or the information contained therein, may be disclosed to any persons other than defendant, counsel for defendant, persons employed or retained to assist the defense, or the person to whom the Material directly pertains, without prior notice to the government and authorization from the United States.

6.      Absent prior permission from the United States, information from Materials shall not be included in any public filing with the Court, and instead shall be submitted under seal (except if the defendant chooses to include in a public document sensitive information Materials relating solely and directly to the defendant), unless the parties agree to the public filing of such information, or all information that would identify the subject of the document or filing has been removed or redacted, or such information has already been publicly disclosed, or the Court rules that it may be filed on the public docket.  The parties will not disclose, publicly or in any pretrial filing or at any pretrial hearing (including any detention hearing), any Materials except in compliance with the procedures set forth herein.

7.      Certain Materials disclosed or to be disclosed by the United States contain particularly sensitive information to be used as exhibits at trial (hereinafter "Sensitive Information"), including, confidential, export-controlled, trade secrets, and/or proprietary information from any and all companies or entities. Sensitive Information will be determined by the redactions set forth in the redacted copies of discovery.  To designate Sensitive Information subject to this Protective Order, the United States shall redact the Sensitive Information in the duplicate copy of the original document provided in discovery; that is the United States will provide a copy of the original document and a redacted copy of the original document with the Sensitive Information removed.

8.      Defendant, defendant's counsel, and Authorized Persons shall not disclose any notes or records of any kind that quote or summarize the contents of the Materials, other than to Authorized Persons.  All such notes or records are to be treated in the same manner as the original materials, except any notes that are attorney work product, including but not limited to, mental

3

impressions and strategies, will be kept by defense counsel in the secure location and are not subject to return to the government.

9.    To the extent any Material is produced by the United States to defendant or defendant's counsel by mistake, the United States shall have the right to request the return of the Material and shall do so in writing. Within five days of the receipt of such a request, defendant and/or defendant's counsel shall return all such Material if in hard copy, and in the case of electronic Materials, shall certify in writing that all copies of the specified Material have been deleted or are in the process of being deleted in the case of system deletion delays from any location in which the Material was stored.

10.    Should any Materials be improperly disclosed by a member of the defense team or a non-defense team member authorized to be in receipt of the Materials, then defense counsel shall use his or her best efforts to obtain the return of any such Materials and to bind the recipient of Materials to the terms of this Order and shall, within ten business days of the discovery of such disclosure, inform the Court and the United States of the unauthorized disclosure and identify the circumstances thereof.

11.    The restrictions set forth in this Order do not apply to documents that are or become part of the public court record, including documents that have been received in evidence at other trials, nor do the restrictions in this Order limit defense counsel in the use of discovery materials in judicial proceedings in this case, except that any document filed by any party which attaches or otherwise discloses Materials, shall be filed under seal to the extent necessary to protect such information, absent prior permission from the United States in accordance with Paragraph 3. The restrictions set forth in this Order also do not apply to the defendants' tax returns or any statements the defendants made, or any copies or recordings thereof.

4

12.     However, with respect to Defendant's access to Materials, Defendant may review Materials in this case only in the presence of a member of the defense team either in person or via videoconference, and Defendant's counsel of record shall ensure that Defendant is never allowed to copy or retain any Materials. Defendant may see and review Materials in the presence of a member of the defense team, but Defendant may not copy, keep, maintain, or otherwise possess any Materials in this case at any time. Defendant must return any Materials to the defense team at the conclusion of any meeting at which Defendant is permitted to view the Materials. Defendant may not take any Materials out of the room in which Defendant is meeting with the defense team. Defendant may not write down or memorialize any Materials. At the conclusion of any meeting with Defendant, the member of the defense team present shall take with him or her the Materials. At no time, under no circumstance, will any Materials be left in the possession, custody, or control of the defendant, whether the Defendant is incarcerated or not. Alternatively, the defendants may privately view the "Materials" on a computer at the United States Attorney's Office with a hard-line telephone available to consult with their attorneys. No United States Attorney's Office personnel may be present when a defendant is speaking to his or her attorney(s). The defendants shall not be allowed to bring in their cellular phones so as to prevent taking screen shots of the "Materials."

13.     The defense team may only use the Materials for the purpose of litigating this criminal case, including any direct or collateral appeal.

14.     Nothing in this Order shall restrict use by the parties of Materials contained therein during the parties' investigation of the allegations, litigation, or introduction as evidence at trial, except that any documents, papers, or pleadings filed with the Court that: (a) quote directly from Materials; (b) summarize or refer to the contents of Materials;  (c) attach copies of Materials, or

(d) in any other way use Materials shall be filed under seal, unless the parties agree to the public filing of such information, or all information that would identify the subject of the document or filing has been removed or redacted, or such information has already been publicly disclosed, or the Court rules that it may be filed on the public docket. The procedures for use of Materials designated by either of the parties for use in Court during any hearing or the trial of this matter shall be determined by the parties and the Court in advance of the hearing or trial. No party shall disclose in open Court that Materials that they seek to use without prior consideration by the Court.

15.     Defense counsel shall maintain all Materials in a secure and safe area and shall exercise the same standards of due and proper care with respect to the storage, custody, use, and/or dissemination of such information as are exercised by the recipient with respect to his own confidential information.  In addition, except as set forth below with respect to export-controlled information, trade secrets, and proprietary information–related information, non-defense team members authorized to be in receipt of Materials pursuant to this Protective Order shall have in place appropriate administrative, technical, and physical safeguards to protect the privacy of the Materials.  No one other than the defense counsel may maintain any export-controlled information, trade secrets, or proprietary information.

16.     Within ten days of any final judgment in this case by the later of: i) the sentencing of Defendant, ii) Defendant's direct appeal, if any, or iii) dismissal of the indictment with or without prejudice; or (iv) within ten days of the termination of a particular Defendant's counsel's representation, Defendant and Defendant's counsel shall return to the United States all materials subject to this Order, including all Materials and all recordings and/or documents in which Materials can be seen, heard or is discussed in terms that could lead to the disclosure of any export-controlled information, trade secrets, and proprietary information and any copies thereof.

Defendant and Defendant's counsel shall return to the United States all other documents designated Materials and all copies thereof, including any derivative discovery materials (e.g., verbatim transcripts of recordings or transcripts), or shall destroy them and certify in writing to counsel for the United States that the documents have been destroyed. Defense counsel reserves the right to petition this Court for an extension of this ten-day time period as needed. Furthermore, the defense counsel may maintain work product containing Materials subject to the protections of this Protective Order for a period of ten years following the entry of final judgment and must thereafter destroy any and all such work product.

17.     This Protective Order does not prevent any party from objecting to discovery that it believes to be otherwise improper. Further, this Protective Order does not constitute a ruling on the question of whether any particular document or other item in the Materials is properly discoverable or admissible and does not constitute a ruling on any potential objection to the discoverability or admissibility of any material.

18.     Rule 16(d)(2) provides sanctions for failing to comply with the Court's Order that are just under the circumstances. Both parties shall use their best efforts to confer with the opposite parties regarding this Order before seeking relief from the Court, and neither party shall seek to have the Court impose sanctions pursuant to Rule 16(d)(2) without providing notice to the other party at least five business days in advance.

19.     Nothing in this Order shall prevent any party from seeking modification of this Protective Order. The party seeking modification must first discuss any proposed modifications with opposing counsel and attempt to reach resolution before seeking a modification from this Court.

20.     This Order shall survive the termination of this Criminal Case and shall continue in full force and effect thereafter.

21.     This Order does not modify the Government's discovery obligations set forth in the Court's Discovery Order, the Federal Rules of Criminal Procedures, or under *Brady v. Maryland* and *Giglio v. United States* and their progeny.

IT IS SO ORDERED this _____th day of June 2022.


_____
HONORABLE XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

8