UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>XIAOJIAN TAO,<br><br><br>Defendant. | Case No. SA-22-CR-170-XR |

**DEFENDANT XIAOJIAN TAO'S SENTENCING MEMORANDUM IN SUPPORT OF A DOWNWARD DEPARTURE/VARIANCE AND A NON-CUSTODIAL SENTENCE**

Dr. Xiaojian Tao, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing, and requests the Court to depart downwards—or, in the alternative, grant a downward variance—on the basis of Dr. Tao's age and severe heart disease, and impose a sentence of home confinement in lieu of a prison sentence.

**I.   BACKGROUND**

Dr. Tao was born 65 years ago in Shihezi City, Xinjiang Province, Northwest China. Dr. Tao's was a large family: he had two brothers and three sisters, and his maternal grandparents also lived with the family. His father was a professor of classical literature, and his mother was a middle school teacher. Both had received their education during the Jiang Kai-shek era in the 1940's.

Things changed dramatically when Dr. Tao was four years old after Mao Zedong came to power and sought to "reeducate" Chinese intellectuals by sending them into the countryside. One day, Dr. Tao's grandparents informed him that his parents would be sent to the countryside to be "reeducated" by peasants. Before Dr. Tao could grasp what this meant, the entire family was

1

loaded onto an open-top truck and driven 300 kilometers west from their city of approximately 300,000 people to a desert area with a population of only a few hundred. When the truck finally stopped, the driver said, "This is where you will make your life from now on." It was a barren wilderness. The locals lived in underground cells. Dr. Tao's family was also assigned to an underground cell where he would live with his extended family.

Dr. Tao's parents were assigned manual labor work with the local peasants during the day and returned home only in the evening. Their "home" had no electricity or running water. They used a small stove in the hallway of their "cell" for heating and cooking and had to carry in water for washing and cooking with barrels. Kerosene lamps were the only source of light. Food was extremely scarce, and largely consisted of corn or corn starch. Meat was almost never eaten.

It was in this underground cell that Dr. Tao's grandparents taught him how to read and write, using poems that his father had written for him. Dr. Tao can still recall some of these poems, as they mostly described their surroundings, the natural scenery, and the wild animals they frequently encountered.

Dr. Tao was permitted to attend elementary and middle school, but was barred from attending high school for nearly three months without explanation. Despite being highly recommended by many teachers and the school president, the local government refused to acknowledge that this was due to political reasons. During Mao's Cultural Revolution, such political obstacles were common. Eventually, Dr. Tao was permitted to attend high school, and graduated in 1976.

After high school, Dr. Tao worked doing manual labor jobs for two years. When universities reopened to students who could pass the entrance exams, he was excited and confident that he would succeed. Dr. Tao applied to several highly-ranked universities and, after waiting

anxiously, received an unexpected acceptance letter from an agricultural university to which he had not applied. Dr. Tao later was able to transfer to Chengdu University to complete his Bachelor's degree.

After earning his Bachelor's degree, Dr. Tao returned to the agricultural university to work. While there, he took the entrance exam for a Master's program at Southeast University. When he did not receive an admission letter, he contacted the admissions office and was informed that the professor under whom he sought to study doubted the authenticity of his test papers; the professor suspected the test results were the result of a group effort since there were no top-ranked universities in the area where Dr. Tao had lived. Dr. Tao immediately contacted the professor to explain that he had completed the test on his own. Two days later, the professor invited Dr. Tao for an in-person interview in Nanjing. After three days travel by train, Dr. Tao passed the interview and received late acceptance into the program. He completed his Master's degree in mechanical engineering in 1985.

Following graduate school, Dr. Tao returned to the agricultural university while waiting for the results to apply for a PhD program in the United States. He was eventually admitted to Oklahoma State University and began his studies there in January 1986. Dr. Tao supported himself while in school with both teaching and research assistantships. During his time at Oklahoma State, Dr. Tao married Yu Lang, whom he had known in China and who had joined him to also study at Oklahoma State. They soon had their first child, a boy, and Yu was not able to complete her Graduate degree. Dr. Tao, however, graduated with a PhD and continued to work at the university for a year before joining Fluid Technologies Inc. (FTI) as a chief scientist, where he worked for four years. During this period, Dr. Tao and his wife had their second child, another boy.

In 1994, Dr. Tao moved his family from Oklahoma to San Antonio, Texas, where he joined Southwest Research Institute (SwRI) as a senior mechanical engineer specializing in filtration and contamination testing. At SwRI, Dr. Tao built a successful filtration and dust contamination testing center, which generated over $40 million in revenue for his company over 25 years. Dr. Tao consistently received high performance reviews and helped establish SwRI as a leader in its field. As Dr. Tao's colleagues have noted, Dr. Tao is an exceptionally talented engineer. *See* Ex. 3 – 7.

## II. THE INVESTIGATION AND ARREST OF DR. TAO

Dr. Tao's life was upended in December 2016, when the FBI erroneously and baselessly came to suspect that he was involved in espionage for China. The FBI watched and investigated him closely for three years. The FBI searched his home and office in December 2019, and two years and four months later he was arrested and ultimately charged, along with his wife, in a 22-count Indictment alleging export control violations, wire-fraud, false statements, and failing to report all of his income on his taxes.

After the smoke cleared, however, it eventually became clear that Dr. Tao was not guilty of wire fraud, or export violations, or false statements. Rather. Dr. Tao's illegal activity involved a garden-variety failure to report on his income taxes money he earned for a side-business, Tyletech, that he and his wife operated from their home. Tyletech was an entirely legitimate company, which provided engineering consulting and specialty sensors and test equipment. While the establishment of this side business ran afoul of his employment agreement with SwRI, this violation of company policy did not violate federal law. *See* ECF 124 at 2–3. Nevertheless, while the income earned by Tyletech was entirely lawful, Dr. Tao failed to report approximately $2.4 million in net income, earned over the course of seven years, between 2012 and 2019, on his income taxes.

Dr. Tao has acknowledged this failure by pleading guilty and accepting responsibility for his conduct.

### III. DR. TAO'S HEART ATTACK AND ONGOING HEALTH ISSUES

On May 30, 2023, while Dr. Tao and his wife were in Colorado Springs to see their son graduate from the Air Force Academy, Dr. Tao collapsed and nearly died, stricken by a massive heart attack. It was only because of the immediate medical attention Dr. Tao received from President Biden's personal physician, who had been attending the ceremony with the President, that Dr. Tao was resuscitated, and his life saved. Before he could be transported to the hospital, Dr. Tao's heart stopped twice, and both times he was resuscitated by experienced doctors using a combination of CPR and a defibrillator. Dr. Tao was transported to UCHealth Memorial Hospital North in Colorado Springs where doctors found that three of Dr. Tao's four major coronary arteries were between 95–99.5% blocked. Although stents were implanted, because of the weakness of his heart, bypass surgery, which would normally have been prescribed with a patient suffering from blocked arteries, was deemed to be too risky.

Since his heart attack, Dr. Tao has been house-bound. He only leaves his home for doctor's appointments and court appearances. He has been instructed by his doctor to try and walk when he can, so Dr. Tao does leave his house on occasion for short walks in his neighborhood on days he feels stronger.

Dr. Tao's prognosis is not good. Testing revealed that his heart's functioning is greatly compromised, with three of the four major coronary arteries almost fully blocked. *See* Ex. 1, Letter from Dr. Scott Moore. Dr. Tao also suffers from permanent atrial fibrillation. *See* Ex. 2, Letter from Dr. Stephen May. Dr. Tao's physicians treat his condition with rest, diet, and six medications which he must take several times per day. *See* Ex. 1, Letter from Dr. Scott Moore.

Dr. Tao's life has been dramatically and severely impacted by his heart attack. Prior to the heart attack, Dr. Tao routinely worked 12-15 hour days. Now, he struggles simply to get around his house. A trip up a flight of stairs can be exhausting. Any prolonged work is not possible, as he is quickly fatigued, impacting his ability to concentrate. Whereas before the heart attack he was a "young" and energetic 64 year-old, he feels as if he has aged 15 years in the past year, although he is "only" 65 years old.

## IV. THE PSI REPORT OVERSTATES THE AMOUNT OF RESTITUTION OWED

The PSI report (*see* PSI Rep. ¶18) incorrectly states the amount of tax due and owing. The figures in the report mirror the IRS special agent's report. The IRS special agent calculated the tax due by including the underreported gross receipts on Dr. Tao's tax return but made no other correlative adjustments. The special agent did not include expenses, credits, or otherwise account for different tax rates that apply to capital gain property. The special agent thereafter applied the highest marginal tax rate, ranging from 35% to 39.6% depending on the tax year.

The government bears the burden of establishing the amount of tax loss by a preponderance of the evidence. *United States v. Tucker*, 217 F.3d 960, 961 (8th Cir. 2000) ("the government has the burden at sentencing to prove fact-intensive issues such as tax loss by a preponderance of the evidence."). The Guidelines Manual offers a presumptive method for calculating tax loss. Section 2T1.1(c)(1)(A) states that when "the offense involved filing a tax return in which gross income was underreported, the tax loss **shall** be treated as equal to 28% of the unreported gross income …unless a more accurate determination of the tax loss can be made." (emphasis added). Here, the presumptive 28 percent rule should apply.

The government bears the burden of showing that its methodology results in a "more accurate determination of the tax loss." It has not met that burden. The government's computations

make no effort to account for expenses, credits, or differing tax rates (such as capital gains rates) attributable to the underreported income. The computations simply take the total unreported business income and add it to the returns applying the highest marginal rates. The computations are thus the equivalent of preparing only half of a tax return, reflecting income but not expenses. The result is an inaccurate tax loss calculation.

The flawed computations are highlighted with a few examples.

First, consider the capital gain issue. If a business buys equipment for $10 and sells it for $15 dollars, it is taxed only on the $5 gain. The business is not taxed on the $10 portion that is attributable to recovery of its cost. Moreover, the $5 gain portion would be taxed at a capital gains rate rather than the ordinary income rate (typically 15% rather than 35%). Here, Dr. Tao purchased at least one large piece of testing equipment for $78,000 which he spent several years upgrading and improving and later sold for $420,000. Thus, only approximately $340,000 should have been subject to tax and it would have been subject to a capital gains rate of 15 percent rather than a marginal rate of 35 percent. This is just one example of how the government's computations are inaccurate in this respect.[1]

Moreover, virtually no businesses have a 100% profit margin. Businesses must spend some money in order to generate income.[2] The proper marginal tax rate is to be applied to the *net* taxable income, not the *gross* income. Like most businesses, Dr. Tao had overhead expenses such as internet, telephone, travel, utilities, and more. All those expenses are properly deductible from

---

[1] Because the FBI seized all of Dr. Tao's computers and financial records, it is not possible for him to recreate all of his business expenses from memory.

[2] If a coffee shop generates $100 in income, it is entitled to deduct the cost of beans, cups, sugar, milk, etcetera. If those expenses add up to $40, then the tax is computed on the *net* taxable income of $60 ($100 gross income - $40 expenses).

gross receipts and only the *net* amount of taxable income is subject to tax. Yet here, the government added over $2.5 million dollars in gross receipts to Dr. Tao's taxable income but failed to account for a single dollar of expense that would have been necessary to incur in generating those gross receipts. The government's tax loss computations are thus incorrect because the "very definition of 'loss' contemplates the consideration of unclaimed deductions," and the government failed to take deductions into account when determining the tax loss. *United States v. Maali*, No. 6:02-cr-171-Orl-28KR, 2005 WL 2204982, at * 12 (M.D. Fla. Sept. 8, 2005).

Because of the inherent challenge in accounting for expenses and rate differences on tax returns that are years' old, the sentencing guidelines create a presumptive flat 28 percent tax loss to all unreported gross income. At least one court has explained that the Guidelines "expressly foresaw such post-hoc wranglings over the proper amount of taxable income by defendants who failed to declare their income in the first place." *United States v. Trivedi*, 152 F.3d 921, 921 (2d Cir. 1998). The 28 percent presumption "provided a rough proxy for the true damage to the government by permitting the tax loss in such cases to be derived from gross income." *Id*.

If the statutory, and presumptive, 28 percent loss amount is used, then the amount of restitution owed is $683,898.83, rather than the $973,282.76 figure used in the PSI report.

V. **THE GUIDELINES ARE ADVISORY AND THE SENTENCE SHOULD BE NO GREATER THAN NECESSARY TO SATISFY THE STATUTORY PURPOSES UNDER § 3553**

At the outset of sentencing, the Court must determine the applicable Sentencing Guidelines range. *See Molina-Martinez v. United States*, 578 U.S. 189, 193 (2016). Although the Guidelines were once mandatory, following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines no longer carry the force of law, federal judges are no longer bound to strictly apply them, and "[a] district court may not presume that a Guidelines sentence is reasonable." *United States v. Cavera*,

550 F.3d 180, 189 (2d Cir. 2008) (en banc). The Guidelines are now purely advisory, and the Court has significant discretion to vary from the Guideline range. *See id.* at 187–88. Instead of applying the Guidelines as compulsory, the Court has discretion to impose a non-Guideline sentence as long as the sentence is reasonable and justified. *See United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc) ("*Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."), *abrogated on other grounds by Rita v. United States*, 551 U.S. 338 (2007); *see also Koon v. United States*, 518 U.S. 81, 96–97 (1996) (determining that a district court is vested with broad discretion to depart from the Guidelines); U.S.S.G § 5K2.0 (2018).

The Guidelines are now but a "starting point and initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 39 (2007). After calculating the Guidelines range, the Court must then "make an individualized assessment based on the facts presented" by the parties. *Id.* Post-*Booker* sentencing involves two steps—after the first step of calculating the Guideline range, the Court must engage in the second step of considering the 18 U.S.C. § 3553(a) factors to determine a reasonable sentence. *See United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005), *abrogated on other grounds by Rita*, 551 U.S. at 338. Just as the Court has discretion to impose a non-Guidelines sentence, "the weight to be afforded any § 3553(a) factor is a matter firmly committed to the discretion of the sentencing judge." *United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) (quotation marks omitted). Furthermore, the Court has discretion to decide whether any § 3553(a) factor justifies a downward variance. *See Gall*, 552 U.S. at 51. When imposing a sentence outside the Guidelines range, the Court applies a non-mathematical formula with individualized assessments based on facts presented by the parties. *Id.* at 47, 50. This Court must be guided by the fact that the ultimate sentence should be "not greater than necessary to accomplish

9

the sentencing goals advanced in § 3553(a)(2)." *Kimbrough v. United States*, 552 U.S. 85, 111 (2007) (quotation marks omitted).

### VI. A DOWNWARD DEPARTURE, OR VARIANCE, IS WARRANTED DUE TO DR. TAO'S SERIOUS HEART CONDITION, PURSUANT TO U.S.S.G § 5H1.4

The Court may depart—or, alternatively, grant a downward variance—if it finds that a defendant has "an extraordinary physical impairment . . . [and if] in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4. Dr. Tao's heart attack has resulted in him becoming infirm, such that his doctors "strongly advise against incarceration" because of the inability of Dr. Tao to receive the proper diet, his multiple medications, and the additional stress that would result. *See* Ex. 1, Letter from Dr. Scott Moore.

There is ample support from cases around the country where courts have departed downwards, pursuant to U.S.S.G. § 5H1.4, in similar circumstances. *See United States v. Martin*, 363 F.3d 25, 49 (1st Cir. 2004) (showing defendant pled guilty to fraud and tax evasion, with adjusted offense level of 17, sentenced to three years' probation with six months in home detention after downward departure due to the defendant's Crohn's disease and related constellation of maladies; departure is warranted if a "court may find such an extraordinary impairment when imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet the defendant's medical needs."); *United States v. Willis*, 322 F. Supp. 2d 76 (D. Mass. 2004) (showing a 69 year-old defendant convicted of tax evasion, with adjusted offense level of 16 and Guideline range of 21-27 months, granted a 7-level departure and sentence of probation due to multiple medical conditions); *United States v. Pineyro,* 372 F. Supp. 2d 133, 138 (D. Mass 2005) (showing a downward departure granted to defendant with offense

level of 21, facing 46-57 months, to time-served, due to "serious and imminent medical threat [ ] which would be made worse by incarceration, and/or [ ] which the Federal Bureau of Prisons cannot adequately treat."); *United States v. Collins,* 122 F.3d 1297, 1300 (10th Cir. 1997) (showing no abuse of discretion to depart downwards pursuant to § 5H1.4 for a 64 year-old defendant with an adjusted offense level of 17, and guidelines range of 37-46 months, due to his "age in addition to his various infirmities, including heart disease, high blood pressure, ulcers, arthritis and prostatitis"); *United States v. Baron*, 914 F. Supp. 660, 664 (D. Mass. 1995) (showing a 76 year-old defendant, convicted of bank fraud, granted downward departure pursuant to § 5H1.4 due to his cardiac condition and other maladies, finding that "imprisonment is not efficacious particularly where the offender is not as likely to commit future crimes as a younger offender" and noting that "the Commission permits home confinement as an alternative form of punishment when home confinement of an elderly and infirm defendant is 'equally efficient as and less costly than incarceration.'"); *United States v. Barbato*, No. 00 CR 1028(SWK), 2002 WL 31556376, at *5 (S.D.N.Y. Nov. 15, 2022) (showing downward departure pursuant to U.S.S.G. § 5H1.4 granted for 81 year-old defendant convicted of extortion, with an adjusted offense level of 17, due to his suffering from hypertension, carotid artery disease, and coronary artery disease, where "the combination of Barbato's medical condition and his advanced age are such that a downward departure would be appropriate."); *United States v. Rioux,* 97 F.3d 648 (2d Cir. 1996) (showing no abuse of discretion to depart downward 10 levels, pursuant to § 5H1.4, and sentence defendant to three years' probation, six months' home confinement and community service where defendant had previously had a kidney transplant and his current kidney was diseased, requiring "he must receive regular blood tests and prescription medicines.").

Dr. Tao's circumstances fall squarely within this line of cases. He is 65 and has suffered a nearly fatal heart attack. He has massively occluded arteries which cannot be relieved through surgery. He is frail and weak and has difficulty in taking care of himself in the best of circumstances. The district court's rationale for departing downward in *Willis* could be applied with equal force to Dr. Tao's situation:

> Mr. Willis is not likely to be a recidivist; incapacitation at his age, with these conditions, could be a death sentence. Retribution does not justify his incarceration. The offense is not a crime of violence; the victim, the IRS, will be repaid. Nor is there any danger that this departure will open an exception through which many defendants will seek to pass.

322 F. Supp. 2d at 85.

Dr. Tao poses little to no risk of recidivism. Given his poor health, he is unable to work and, therefore, he has little prospect of earning any income. Therefore, the crime for which he was convicted—failure to report income—is extraordinarily unlikely to reoccur. He must carefully monitor his diet and medication regimen. It seems unquestionable that a period of incarceration would significantly diminish his already-reduced life expectancy. "A court may find such an extraordinary impairment when imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet the defendant's medical needs." *United States v. Martin*, 263 F.3d at 49. In these circumstances, "home confinement might be equally efficient as and less costly than incarceration." *United States v. Baron*, 914 F. Supp. at 664; *see also* Weinstein, *Prison Need Not Be Mandatory*, 28 No. 1 Judge J. 16 (1989) ("The best policy considerations can be unnecessarily cruel when applied rigidly and without exception to individual human beings . . . Some [offenders] would be destroyed by a term of prison. There are defendants for whom prison incarceration makes no sense.")

## VII. CONCLUSION

Dr. Tao not only has no criminal history; he has no prior arrests. There can be no serious suggestion that Dr. Tao is at risk to re-offend. A non-custodial sentence of home confinement is appropriate and justified under all of the circumstances.

Dated: September 25, 2024                           Respectfully submitted,

By: *Peter R. Zeidenberg*
Peter R. Zeidenberg (*pro hac vice*)
Michael F. Dearington (*pro hac vice*)
ArentFox Schiff LLP
1717 K St NW
Washington, DC 20006
Peter.Zeidenberg@afslaw.com
Michael.Dearington@afslaw.com
Tel: 202-857-6000
Fax: 202-857-6395

Apeksha Vora (*pro hac vice*)
ArentFox Schiff LLP
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Apeksha.Vora@afslaw.com
Tel: 212-484-3900
Fax: 212-484-3990

*Attorneys for Defendant Xiaojian Tao*

## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on September 25, 2024, a true and correct copy of the foregoing has been electronically filed with the Court and served to all counsel of record via CM/ECF.


                                      */s/ Peter R. Zeidenberg*
                                      Peter R. Zeidenberg